# No. 15–51077

In the
United States Court of Appeals
for the Fifth Circuit

---

State of Texas,

*Plaintiff–Appellant*

v.

Charles Kleinert,

*Defendant–Appellee*

---

On Appeal from the United States District Court for the Western District of
Texas, Austin Division, Case No. A14–CR–0388–LY

---

## Appellant's Petition for Rehearing En Banc

---

EMILY EDWARDS
M. SCOTT TALIAFERRO
ROSA THEOFANIS
Assistant District Attorneys

MARGARET MOORE ✭ TRAVIS COUNTY DISTRICT ATTORNEY
P.O. Box 1748 Austin, Texas  78767
Telephone: 512–854–9400  •  Fax: 512–854–4206

## Certificate of Interested Persons

Counsel of record certifies that the following persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| | |
|---|---|
| *Attorneys for Plaintiff– Appellant, the State of Texas*: | The Hon. Margaret Moore<br>Travis County District Attorney<br><br>Ms. Andrea Austin<br>Ms. Dayna L. Blazey<br>Ms. Laurie Hess Drymalla<br>Ms. Emily Edwards<br>Mr. Ken Ervin<br>Mr. M. Scott Taliaferro<br>Ms. Rosa Theofanis<br>Assistant District Attorneys<br>Travis County District Attorney's Office<br>P.O. Box 1748<br>Austin, TX 78767<br>(512) 854-9400<br>(512) 854-4206 (Fax) |

| | | |
|---|---|---|
| *Attorneys for Defendant- Appellee Charles Kleinert*: | Mr. Randy T. Leavitt<br>LEAVITT \| TIBBE<br>ATTORNEYS AT LAW<br>1301 Rio Grande<br>Austin, TX 78701<br>(512) 476-4475<br>(512) 542-3372 (Fax) | Mr. Eric J.R. Nichols<br>Mr. Karson Thompson<br>BECK REDDEN LLP<br>515 Congress Ave.,<br>Suite 1900<br>Austin, TX 78701<br>(512) 708-1000<br>(512) 708-1002 (Fax) |

*/s/ Rosa Theofanis*
ROSA THEOFANIS
*Attorney of record for Appellant*

i

## Statement Regarding En Banc Review

En banc review is necessary to maintain the uniformity of the Court's decisions and to consider questions of exceptional importance.

First, in relying on a "scope of employment" test to hold that the defendant asserted a colorable federal defense, the panel's decision conflicts with the Supreme Court's decisions in *Mesa v. California*, 489 U.S. 121 (1989), and *Colorado v. Symes*, 286 U.S. 510 (1932), and the Fourth Circuit's decisions in *North Carolina v. Cisneros*, 947 F.2d 1135 (4th Cir. 1991), and *North Carolina v. Ivory*, 906 F.2d 999 (4th Cir. 1990).  This conflict is of exceptional importance because, under *Mesa*, "it is the raising of a federal question in the officer's removal petition that constitutes the federal law under which the action against the federal officer arises for Art. III purposes."  489 U.S. at 136.  Because this case impacts the scope of federal officer removal from state prosecution on Supremacy Clause grounds, it is also a matter of great importance to our system of federalism and its "sensitivity to the legitimate interests of both State and National Governments." *Younger v. Harris*, 401 U.S. 37, 44 (1971).

The panel's failure to review the district court's dismissal of the indictment under the legal standard applicable to motions brought under Rule 12(b)(1) of the Federal Rules of Criminal Procedure conflicts with the Supreme Court's decisions in *United States v. Covington*, 395 U.S. 57 (1969), and *Boyce Motor Lines, Inc. v.*

*United States*, 342 U.S. 337 (1952).  The panel's decision also conflicts with the decisions of this Court on waiver, including *United States v. Lopez–Escobar*, 920 F.2d 1241 (5th Cir. 1991).  Finally, it conflicts with the authoritative decisions of a number of other circuits.  *See Wyoming v. Livingston*, 443 F.3d 1211 (10th Cir. 2006); *New York v. Tanella*, 374 F.3d 141 (2d Cir. 2004); *Idaho v. Horiuchi*, 253 F.3d 359 (9th Cir. 2001) (en banc), *vacated as moot*, 266 F.3d 979 (9th Cir. 2001); *Kentucky v. Long*, 837 F.2d 727 (6th Cir. 1988).  En banc review of the panel's decision is necessary to maintain the uniformity of the law governing motions to dismiss brought under Federal Rule of Criminal Procedure 12.

# Table of Contents

Certificate of Interested Persons .................................................................. i
Statement Regarding En Banc Review ................................................... ii
Table of Contents .................................................................................. iv
Table of Authorities .............................................................................. v
Statement of the Issues ...........................................................................1
Statement of the Course of Proceedings ...............................................1
Statement of Facts ...................................................................................2
Argument....................................................................................................3

    I.    The panel's use of a "scope of employment" federal officer
removal test—previously rejected by the Supreme Court—
threatens the uniformity of the law and raises questions of
exceptional importance.................................................................3

          A.    The panel's analysis conflicts with decisions of the Supreme
Court and other circuits.........................................................3

          B.    The panel's effective erasure of the "colorable federal defense"
pleading requirement raises Constitutional problems. .........................8

    II.    The panel's failure to review of the district court's decision
according to the legal standards applicable to pretrial motions to
dismiss the indictment threatens the uniformity of the law and
leaves future litigants without guidance........................................9

          A.    The panel's analysis conflicts with decisions of the
Supreme Court, this Court, and other circuits. .....................................9

          B.    The panel's silence regarding the standard it applied to
the district court leaves future litigants without guidance...................14

Conclusion ..........................................................................................14
Certificate of Service ...........................................................................15
Certificate of Compliance .....................................................................15
Appendix: Panel Opinion.......................................................................16

# Table of Authorities

## Cases

*Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337 (1952)..........................9, 10

*Colorado v. Symes*, 286 U.S. 510 (1932)....................................................6

*Gay v. Ruff*, 292 U.S. 25 (1934)................................................................8

*Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975) ...........................................3

*Idaho v. Horiuchi*, 253 F.3d 359 (9th Cir. 2001) (en banc), *vacated as moot*, 266

    F.3d 979 (9th Cir. 2001) ................................................................ 13, 14

*Kentucky v. Long*, 837 F.2d 727 (6th Cir. 1988) .............................................. 12–13

*Marbury v. Madison*, 5 U.S. 137 (1803)....................................................8

*McCaig v. Wells Fargo Bank (Tex.), N.A.*, 788 F.3d 463 (5th Cir. 2015)...............11

*Mesa v. California*, 489 U.S. 121 (1989)............................................... 3, 4, 5, 6, 7, 8

*New York v. Tanella*, 374 F.3d 141 (2d Cir. 2004)...................................13

*North Carolina v. Cisneros*, 947 F.2d 1135 (4th Cir. 1991) ....................................7

*North Carolina v. Ivory*, 906 F.2d 999 (4th Cir. 1990) ...........................................7

*Texas v. Kleinert*, 143 F. Supp. 3d 551 (W.D. Tex. 2015) ........................... 2, 11, 12

*Texas v. Kleinert*, No. 15-51077, 2017 U.S. App. LEXIS 6951 (5th Cir. April 20,

    2017) ........................................................................................ *passim*

*Texas v. Kleinert*, No. A-14-CR-388-LY, 2015 U.S. Dist. LEXIS 55180 (W.D.

    Tex. 2015)................................................................................ 1, 2, 5

*United States v. Covington*, 395 U.S. 57 (1969)......................................................10

*United States v. Lopez–Escobar*, 920 F.2d 1241 (5th Cir. 1991) ...................  11, 12

*Willingham v. Morgan*, 395 U.S. 402 (1969) ...........................................................5

*Wyoming v. Livingston*, 443 F.3d 1211 (10th Cir. 2006) ........................................13

*Younger v. Harris*, 401 U.S. 37 (1971)...............................................................8, 9

## Statutes and Rules

28 U.S.C. § 1442...................................................................................................3, 4

FED. R. CRIM. P. 12 ..................................................................................... 10, 12, 13

## Statement of the Issues

1. Given the explicit rejection by the Supreme Court in *Mesa* of a "scope of employment" test for federal officer removal of state prosecutions, was the panel's conclusion that the defendant was acting as a federal officer at the time of the conduct that forms the basis of his prosecution sufficient to satisfy *Mesa*'s "colorable federal defense" requirement for removal?

2. Where the district court concluded that the facts of the case "are not in material dispute" and granted the motion to dismiss the indictment citing Rule 12, did the panel correctly decline to apply the appropriate legal standard to motions brought under Rule 12 of the Federal Rules of Criminal Procedure in its review of the district court's ruling?

## Statement of the Course of Proceedings

The grand jury of Travis County, Texas, indicted the defendant for manslaughter for fatally shooting Larry Jackson, Jr. *Texas v. Kleinert*, No. A-14-CR-388-LY, 2015 U.S. Dist. LEXIS 55180, at *1 (W.D. Tex. 2015). Following indictment by the grand jury, the defendant removed the case to the United States District Court for the Western District, pleading that, as a federal officer, he was immune from prosecution under the Supremacy Clause of the United States Constitution. *Id.* at *1, *18. The district court denied the State's motion for summary remand and assumed jurisdiction of the state court criminal prosecution

1

of the defendant for manslaughter. *Id*. Upon removal, the defendant filed a motion to dismiss the indictment under Federal Rule of Criminal Procedure Rule 12(b), claiming Supremacy Clause immunity. *Texas v. Kleinert*, 143 F. Supp. 3d 551, 555–557 (W.D. Tex. 2015). After an evidentiary hearing, the district court concluded that the facts regarding Supremacy Clause immunity "are not in material dispute" and granted the motion to dismiss the indictment on those grounds, citing Rule 12. *Id.* at 556 n.3, 557. A panel of this Court affirmed, finding that the district court properly exercised jurisdiction and properly applied the doctrine of Supremacy Clause immunity when dismissing the State's indictment. *Texas v. Kleinert*, No. 15-51077, 2017 U.S. App. LEXIS 6951, at *30 (5th Cir. April 20, 2017).[1]

## Statement of Facts

At the time he shot Jackson, the defendant was a police officer commissioned in the State of Texas, on assignment to a joint federal state task force. ROA.1598; ROA.1599.

The defendant had detained Jackson for questioning upon the request of bank employees after Jackson tried to enter a closed bank. ROA.1247–56. When Jackson ran before the interview was complete, the defendant pursued him on foot.

---

[1] Citations to the panel's opinion are based on the pagination in the Lexis version (appended) and are in the form "Op., p."

2

ROA.1631–32.  The defendant caught up with Jackson and attempted to arrest him, fatally shooting him in the process.  ROA.1600; ROA.1607–08; ROA.1637–38; ROA.1847.

Jackson was shot in the back of the neck, which severed his spinal cord and tore his vertebral artery, causing his death.  ROA.1558; ROA.1560–61. The entrance wound on his neck had a "muzzle imprint," demonstrating that the gun was placed directly against his neck when it was fired.  ROA.1558–59.

## Argument

"[T]here ha[s] . . . long existed a strong judicial policy against federal interference with state criminal proceedings." *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 600 (1975).

I.   **The panel's use of a "scope of employment" federal officer removal test— previously rejected by the Supreme Court—threatens the uniformity of the law and raises questions of exceptional importance.**

A.   **The panel's analysis conflicts with decisions of the Supreme Court and other circuits.**

The panel's decision stands in direct conflict with the holding of *Mesa v. California*, 489 U.S. 121 (1989), which sets forth the jurisdictional requirements for federal officer removal.  Quoting *Mesa*, the panel acknowledged that, to remove the action to federal court via 28 U.S.C. § 1442(a)(1), "the officer must . . . allege 'a colorable federal defense' to satisfy Article III's 'arising under' requirement for

3

subject matter jurisdiction." Op., 8 (quoting *Mesa*, 489 U.S. at 129, 136–37). However, the panel's decision conflicts with *Mesa* because the panel applied a "scope of employment" test—a test that *Mesa* explicitly rejected.

*Mesa* considered the removal petitions of two postal workers, each of whom was charged with criminal offenses in California state court after a mail truck driven by that person was involved in a collision. *Id.* at 123. The removal petitions alleged that removal of the criminal complaints to federal district court was proper "because [the postal workers] were federal employees at the time of the incidents and because '*the state charges arose from an accident* involving defendant which occurred while defendant was on duty and acting in the course and scope of . . . employment with the Postal Service.'" *Id.* (emphasis added). However, the petitions in that case were insufficient to support removal, because the two postal workers "ha[d] not and could not present an official immunity defense to the state criminal prosecutions brought against them." *Id.* at 133.

*Mesa* expressly rejected the argument that the phrase "under color of office" in the removal statute (28 U.S.C. § 1442(a)(1)) authorizes removal "whenever a federal official is prosecuted for the manner in which he has performed his federal duties[.]" 489 U.S. at 125; *see id.* at 133–37.

Importantly, *Mesa* also made it clear that, in criminal cases, the language of removal petitions must not be construed in a "liberal" manner. *See Mesa*, 489 U.S.

4

at 133 ("Accordingly, the liberal pleadings sufficient to allege an official immunity defense which we permitted in *Willingham* are inapplicable to removal of the prosecutions before us today."); *see also Willingham v. Morgan*, 395 U.S. 402, 409, (1969) ("In a civil suit of this nature, we think it was sufficient for petitioners to have shown that their relationship to respondent derived solely from their official duties."); *Willingham*, 395 U.S. at 409 n.4 ("Were this a criminal case, a more detailed showing might be necessary because of the more compelling state interest in conducting criminal trials in the state courts.").

Noting the "strong judicial policy" against federal interference with state criminal proceedings, *Mesa* underscored that removal of such prosecutions is proper only when a federal question is raised. 489 U.S. at 129, 138. Thus, under *Mesa*, a removal petition fails to allege a colorable federal defense if it avers only that the state charges arose from an accident that occurred while the federal officer was acting within the scope of his employment. *Id*. at 133. Stated differently, the mere allegation of "an accident" by a federal employee does not raise a federal question.

The defendant's removal notice in this case was, in substance, no different than those of the postal employees in *Mesa*. He alleged that that his weapon had "accidentally discharged" and that removal was warranted because the event occurred within the scope of his federal employment. *Texas v. Kleinert*, 2015 U.S. Dist. LEXIS 55180, at \*8. The panel agreed with the defendant, holding, "Because

5

[the defendant] plausibly alleged that he was acting as a federal officer at the time of the shooting, he sufficiently asserted a colorable federal defense." Op., 12–13; *see also* Op., 6 & n.2, 30. (referring to the shooting as "accidental").

By relying upon the allegation that the defendant acted in his official capacity, the panel applied a "scope of employment" test of the type that *Mesa* explicitly rejected. The result of this was the effective erasure of *Mesa*'s "colorable federal defense" requirement. The panel's decision conflicts with *Mesa* and threatens the uniformity of the law.

The panel's decision also conflicts with the Supreme Court's decision in *Colorado v. Symes*, 286 U.S. 510 (1932). *Symes* considered the removal petition of a federal prohibition agent prosecuted for murder for striking a suspect on the head with his gun, causing his death. 286 U.S. at 514–17. The agent's statement that the prosecution "arises out of and solely by reason of the acts performed . . . as an officer" acting under federal law was insufficient to support removal. *Id*. at 517–18, 520–21. Although the officer also stated that he was attempting arrest at the time of the indicted conduct, this statement likewise failed to "measure up to the required standard" for removal. *Id*. at 516, 520. The panel's reliance upon the defendant's alleged federal status at the time of the shooting conflicts with *Symes*'s insistence that an officer's conduct itself be "justified." *Id*. at 519.

The panel's decision also conflicts with the Fourth Circuit's decisions in *North Carolina v. Cisneros*, 947 F.2d 1135 (4th Cir. 1991), and *North Carolina v. Ivory*, 906 F.2d 999 (4th Cir. 1990), both of which applied *Mesa*, rejected a test for removal focused on the scope of a federal officer's employment, and found that claims of "accident" do not satisfy *Mesa*'s "federal defense" requirements. *Cisneros*, 947 F.2d at 1139–40; *Ivory*, 906 F.2d at 1003.

*Ivory* considered the removal petition of a military convoy driver's prosecution for unintentional death by motor vehicle, and his defense that he believed that it was safe to enter the intersection with his convoy truck. 906 F.2d at 1000–01. *Ivory* held "that these allegations do not constitute a federal defense as required to support removal to federal court." *Id*. at 1001; *see also id.* at 1003 (criticizing dissent for "relapsing into the same 'scope of employment' test for removal of state prosecutions which was explicitly rejected by the Supreme Court in *Mesa*").

*Cisneros* considered a similar claim: a military convoy driver attempted to remove the state's prosecution for vehicular homicide, arguing that he drove involuntarily into a civilian vehicle because of brake failure. 947 F.2d at 1137–39. In that case, "as in *Ivory*, Cisneros had 'failed to present facts in the record taken as a whole that would support an immunity defense.'" *Id*. at 1140 (quoting *Ivory*, 906 F.2d at 1001 n. 2).

7

The panel's acceptance of "accident" as a "colorable federal defense" conflicts with these decisions of the Fourth Circuit.  Op., 6 & n.2, 12–13, 30.

**B.    The panel's effective erasure of the "colorable federal defense" pleading requirement raises serious Constitutional problems.**

The panel's effective erasure of the "colorable federal defense" pleading requirement for federal officer removal is of exceptional importance because *Mesa* held that the federal officer removal statute is "a pure jurisdictional statute," and thus cannot "independently support Art[icle] III 'arising under' jurisdiction."  489 U.S. at 136.  Instead, *Mesa* found that "it is the raising of a federal question in the officer's removal petition that constitutes the federal law under which the action against the federal officer arises for Art[icle] III purposes."  *Id*.  Without the allegation of a "colorable federal defense" as required by *Mesa*, the panel improperly expanded the jurisdiction of the federal courts beyond the bounds established by the Constitution. *See, e.g.*, *Marbury v. Madison*, 5 U.S. 137, 173–80 (1803); *see also Mesa*, 489 U.S. at 136.  ""[T]he federal character of the litigant should not alone confer jurisdiction upon a federal court.'"  489 U.S. at 131 (quoting *Gay v. Ruff*, 292 U.S. 25, 35 (1934)).

The panel's decision also conflicts with a "longstanding public policy against federal court interference with state court proceedings."  *Younger v. Harris*, 401 U.S. 37, 43 (1971).  Applying that policy, *Mesa* "d[id] not recognize any federal interests

that are not protected by limiting removal to situations in which a federal defense is alleged." 489 U.S. at 137.  By contrast, the panel's expansion of removal to include those who have not alleged a federal defense is an unwarranted intrusion on the legitimate interests of the state. *Younger*, 401 U.S. at 44.

II.    **The panel's failure to review the district court's decision according to the legal standards applicable to pretrial motions to dismiss the indictment threatens the uniformity of the law and leaves future litigants without guidance.**

A.    **The panel's analysis conflicts with decisions of the Supreme Court, this Court, and other circuits.**

By declining to require the district court to assume the truth of the allegations in the indictment in its review of the district court's grant of the defendant's motion to dismiss the indictment, the panel's decision also creates a conflict with the Supreme Court's decision in *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337 (1952), which requires such an assumption.  *Boyce* stated, "This case is here to review the granting of a motion to dismiss the indictment.  It should not be necessary to mention the familiar rule that, at this stage of the case, the allegations of the indictment must be taken as true." 342 U.S. at 343 n.16.   Nonetheless, the panel characterized the State's request to require the district court to "assume the truth of the allegations in the indictment" as a request to apply the standard used in "out-of-circuit" cases and declined to comment on the "propriety" of that standard.  Op., 14 n.6.  The panel decision conflicts with *Boyce* because the panel did not require the

9

district court to assume the truth of the allegations in the indictment even though the immunity defense was decided by way of a pretrial motion to dismiss the indictment. 342 U.S. at 343 n.16; Op., 30.

The panel decision also conflicts with *United States v. Covington*, 395 U.S. 57 (1969). *Covington* held that, under Federal Rule of Criminal Procedure 12, a defense may be decided pretrial only "if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." 395 U.S. at 60. This rule applied because the immunity defense was raised and decided by a Rule 12 motion to dismiss, but the panel characterized the State's request to require the district court to "deny a Rule 12(b) motion to dismiss if the State raises any genuine issue of fact" as a request to apply "out-of-circuit" cases. Op., 14 n. 6. Because the panel did not review the district court's Rule 12 ruling according to the standard set out in *Covington*, the panel's decision creates a conflict with the Supreme Court's holding in that case. 395 U.S. at 60. The panel's decision also conflicts with *Covington* in holding that the applicable standard can be waived by a jury waiver because *Covington*—along with Rule 12 itself—makes it clear that it is the district court that decides a Rule 12 motion such that a jury waiver would be irrelevant. *Id.*

The panel's reliance on a waiver rationale to decline to review the district court according to the Rule 12 standard it applied differs from the holding of this Court in

10

*United States v. Lopez–Escobar* and others related to invited error and waiver so significantly as to create a conflict. 920 F.2d 1241, 1246 (5th Cir. 1991). *Lopez–Escobar*, as well as the case the panel cited in support of its waiver finding, *McCaig v. Wells Fargo Bank (Tex.), N.A.*, 788 F.3d 463, 476 (5th Cir. 2015), state the principle that "[a] party cannot complain on appeal of errors which he himself induced the district court to commit." 920 F.2d at 1246. In those situations, the "district court . . . cannot be faulted for applying the legal standard urged upon it by both parties." *Id.* Accordingly, *Lopez–Escobar* held the parties to the standard they had proposed in the district court—and that court relied upon—because they invited error. *Id.*

Contrary to *Lopez–Escobar*, the panel's finding of waiver in this case did not result in the application of the standard that the district court relied upon, but resulted instead in appellate review disconnected from *any* standard below. The district court granted the motion to dismiss the indictment under Rule 12, concluding that the facts regarding Supremacy Clause immunity "are not in material dispute." *Kleinert*, 143 F. Supp. 3d at 556 n.3, 557 (citations omitted). But, on appeal, the panel declined to review the district court's resolution of the case under Rule 12.[2] Op., 14 n. 6. The panel decision also did not state what alternative standard it applied, including which

---

[2] The panel stated that it would review the district court's grant of the motion to dismiss indictment de novo and would review factual findings underlying that decision for clear error. Op., 14.

11

party bore the burden to prove or disprove the defense in the district court and what standard of proof applied. *Id.* Instead, the panel found that the State had waived the Rule 12 standard by agreeing in a jury waiver to have the district court resolve "any and all factual issues" bearing on the defense. *Id.* Assuming, arguendo, that the State actually waived the Rule 12 standard, the district court did not rely on this—it decided the case within Rule 12. *Kleinert*, 143 F. Supp. 3d at 556 n.3, 557. Failure to employ Rule 12 could not have been an "error" which the State "induced the district court to commit," because the district court purported to apply Rule 12. *Lopez–Escobar*, 920 F.2d at 1246; *Kleinert*, 143 F. Supp. 3d at 557. In finding that the State waived the ability to "complain on appeal" that the district court should be reviewed according to the very standard it applied, the panel strayed so far from the analysis in *Lopez–Escobar* and others as to create a conflict with this Court's previous opinions on the doctrine of invited error. 920 F.2d at 1246.

The panel stated that "regardless of the propriety of the standard applied by other circuits," it would not require the district court to "deny a Rule 12(b) motion to dismiss if the State raised any genuine issue of fact." Op., 14 n.6. This conflicts with the Second, Sixth, Ninth, and Tenth Circuits, which have held that the State meets its evidentiary burden sufficient to defeat a Rule 12 motion to dismiss if the State "at least . . . raise[s] a *genuine* factual issue whether the federal officer was acting pursuant to the laws of the United States and was doing no more than what

12

was necessary and proper for him to do in the performance of his duties." *Kentucky v. Long*, 837 F.2d 727, 752 (6th Cir. 1988) (emphasis in original); *accord Wyoming v. Livingston,* 443 F.3d 1211, 1226 (10th Cir. 2006); *New York v. Tanella*, 374 F.3d 141, 148 (2d Cir. 2004); *Idaho v. Horiuchi*, 253 F.3d 359, 367 (9th Cir. 2001) (en banc), *vacated as moot*, 266 F.3d 979 (9th Cir. 2001) (all citing *Long*, 837 F.2d at 752).

The panel's review of the district court's factual findings for "clear error," Op., 14, also conflicts with Second and Tenth Circuit holdings that, in conducting appellate review, the reviewing court should "view the evidence in the light most favorable to the State and assume the truth of the allegations in the indictment." *Tanella,* 374 F.3d at 148; *accord Livingston*, 443 F.3d at 1226.

Because the motion to dismiss in this case was raised and decided under Rule 12(b), the panel's statement that "[r]egardless of the propriety of the standard applied by other circuits," it would not require the district court "to 'assume the truth of the allegations in the indictment,' and deny a Rule 12(b) motion to dismiss if the State raise[d] any genuine issue of fact" creates conflict with other circuits as well as the Supreme Court. Op., 14 n.6.

**B.** **The panel's silence regarding the standard it applied to the district court decision leaves future litigants without guidance.**

Although the facts of this case inevitably raised the question of what standard applies when a defendant claims Supremacy Clause immunity, the panel decision did not answer the questions applicable to all litigants facing such claims: (1) who bears the burden of proof on the motion to dismiss, (2) what standard of proof applies, and (3) in what light should the evidence be viewed?  As a consequence of this omission, "there is practically no law, and very little guidance" on how to resolve claims of Supremacy Clause immunity, once raised.  *Horiuchi*, 253 F.3d at 374.

## Conclusion

The petition for rehearing en banc should be granted.

Respectfully submitted,

MARGARET MOORE
District Attorney
Travis County, Texas

*/s/ Rosa Theofanis*
ROSA THEOFANIS
Assistant District Attorney
Travis County District Attorney's Office
509 W. 11th St.
Austin, TX  78701
Phone (512) 854–9400

14

## Certificate of Service

This is to certify that on this 4th day of May, 2017, I electronically filed the foregoing petition with the Clerk of the Court by using the appellate CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Rosa Theofanis*
ROSA THEOFANIS
Assistant District Attorney

## Certificate of Compliance

This is to certify that this petition complies with the type volume limitation of Rule 35(b)(2) and 5th Cir. R. 35.5 because it does not exceed 15 pages, excluding material not counted under Rule 32, and complies with the typeface and style requirements of Rule 32(a) and (c)(2) because it was prepared in Microsoft Word using 14-point Times typeface with footnotes in 12 point Times New Roman. This petition contains 3377 words, excluding material not counted under Rule 32.

*/s/ Rosa Theofanis*
ROSA THEOFANIS
Assistant District Attorney

**Appendix: Panel Opinion**

# Texas v. Kleinert

United States Court of Appeals for the Fifth Circuit

April 20, 2017, Filed

No. 15-51077

**Reporter**

2017 U.S. App. LEXIS 6951 *

STATE OF TEXAS, Plaintiff - Appellant v. CHARLES KLEINERT, Defendant - Appellee

**Prior History:** **[*1]** Appeal from the United States District Court for the Western District of Texas. Texas v. Kleinert, 143 F. Supp. 3d 551, 2015 U.S. Dist. LEXIS 152766 (W.D. Tex., 2015)

**Disposition:** AFFIRMED.

**Counsel:** For STATE OF TEXAS, Plaintiff - Appellant: Rosa Theofanis, Michael Scott Taliaferro, Assistant District Attorney, District Attorney's Office for the County of Travis, Austin, TX.

For CHARLES KLEINERT, Defendant - Appellee: Randy Tom Leavitt, Law Office of Randy T. Leavitt, Austin, TX; Eric J. R. Nichols, Beck Redden, L.L.P., Houston, TX.

For AUSTIN BRANCH OF THE NAACP, TEXAS STATE CONFERENCE OF NAACP BRANCHES, Amicus Curiae: Gary Lynn Bledsoe, Bledsoe Law Firm, L.L.P., Austin, TX; Robert Stephen Notzon, Law Office of Robert S. Notzon, Austin, TX.

For FBI AGENTS ASSOCIATION, Amicus Curiae: Richard Lee Swick, Managing Senior Counsel, Swick & Shapiro, P.C., Washington, DC.

For NATIONAL ASSOCIATION OF POLICE ORGANIZATIONS, Amicus Curiae: Michael L. Rickman, CLEAT, Austin, TX; William J. Johnson, National Association of Police Organizations

(NAPO), Alexandria, VA.

For COMBINED LAW ENFORCEMENT ASSOCIATIONS OF TEXAS, Amicus Curiae: Michael L. Rickman, CLEAT, Austin, TX.

**Judges:** Before HIGGINBOTHAM, ELROD, and HIGGINSON, Circuit Judges.

**Opinion by:** STEPHEN A. HIGGINSON

## Opinion

STEPHEN A. HIGGINSON, Circuit Judge:

The District Attorney of Travis **[*2]** County, Texas, sought to prosecute federal task force officer Charles Kleinert for unintentionally shooting an unarmed suspect as Kleinert tried to arrest him. Invoking his status as a federal officer, Kleinert removed the state prosecution to federal court and asked the district court to dismiss the indictment. Kleinert argued that under the Supremacy Clause, he was immune from prosecution by the local district attorney because he acted in his capacity as a federal officer and his conduct was otherwise lawful. After a three-day evidentiary hearing at which the district attorney's office presented little evidence to rebut Kleinert's version of events, the district court—which the parties agreed would resolve all facts relevant to Kleinert's immunity defense—dismissed the indictment. Because the district court properly exercised jurisdiction and properly applied the doctrine of Supremacy Clause immunity, we affirm.

I

2017 U.S. App. LEXIS 6951, *2

Charles Kleinert began working for the Austin Police Department in 1994. In 2011, the FBI specially deputized Kleinert according to Titles 21 and 28 of the United States Code. These deputations "charged [Kleinert] with the duties of investigating violations of the . . . criminal laws of the United States [*3] . . . ." After his deputations, Kleinert worked full-time for the FBI's Central Texas Violent Crimes Task Force. He reported to work each day at an FBI agency, received top-secret security clearance from the federal government, was supervised by a superior FBI agent, and used FBI-issued equipment. As a task force officer, Kleinert's day-to-day duties included investigating federal crimes—specifically, bank robberies.

On the morning of July 26, 2013, someone robbed Benchmark Bank in Austin, Texas. A bank employee described the robber as an older white man. The Central Texas Violent Crimes Task Force, including Kleinert, investigated the robbery. As part of the same-day investigation, Kleinert, in plain clothes, went to the bank to obtain surveillance footage from two employees, Sheila Bostick and Kimberly Menge. Although it was normal business hours, a sign on the front door indicated the bank was temporarily closed (due to the morning's robbery). While Kleinert, Bostick, and Menge discussed the robbery in Menge's office, a black man—later identified as 32-year-old Larry Jackson—came to the bank's front door. Seemingly realizing the bank was closed, Jackson appeared to leave, walking [*4] away to the north side of the bank, but returned one minute later from the south side and pulled on the locked door again.

Thinking she could point Jackson to an open bank nearby, Bostick approached the front door to talk to him, while Kleinert and Menge remained in Menge's office where they could see and hear Bostick's conversation with Jackson. Jackson identified himself as a customer named "William Majors," and asked to withdraw funds from "his" (Majors's) account. Both Bostick and Menge knew that Jackson was not William Majors; the two

women knew Majors because he was not only a large account holder, but also close friends with the bank's president. Uncomfortable with Jackson's representations, Bostick left Jackson outside and asked Kleinert to talk to him.

According to Kleinert,[1] he went outside "to detain Mr. Jackson and question him . . . about what he was attempting to do." Kleinert recounted his conversation with Jackson as follows:

> I asked him if he was Mr. Majors. He said he was not. I said, "What are you doing here?" He said, "I'm trying to get money out of the bank." And I said, "But you're not Mr. Majors." And he said he was Mr. Majors'[s] brother. So I said, "Well let's [*5] call up your brother and see what's going on." He never attempted to make that call [and] that led me to believe that he was fabricating that as well. . . . He had the phone up to his face, and . . . said, "Mom, is the tow truck there yet?" And I said, "Were you involved in a collision?" And he said, "Yeah I was. That's why I'm here. I need to get money for a tow truck and for a rental car." And I said, "Well, where was it?" And he said that it was on I-35. And in looking at him dressed the way he was, dark blue shirt, I asked [him], "How did you get here?" And he said he walked. Well, I knew on that hot day, he did not look like he had been perspiring at all. And if he had walked from I-35, he definitely would have been.

After this exchange, Jackson "took off running," and Kleinert "immediately gave chase," catching up to Jackson under a traffic bridge that travels over a large grassy area with footpaths. As Kleinert neared

---

[1] Because Kleinert is the only surviving witness to his encounter with Jackson, we view his testimony with caution. *See Flythe v. District of Columbia*, 791 F.3d 13, 19, 416 U.S. App. D.C. 190 (D.C. Cir. 2015) (noting that every circuit court to address deadly officer shootings carefully examines the record evidence for consistency with an officer's account). We also note that the district court, as the finder of fact, believed Kleinert was credible, calling his testimony "straightforward, direct, consistent, and without evasion."

Jackson from behind, he "pulled [his] weapon, and . . . yell[ed]: 'Get down on the ground. Get down on the ground.'" Jackson "froze" for a moment before running away again. Kleinert chased Jackson and was "able to reach out with [his] left hand and grab [Jackson] by [*6] the shirt[.]" Kleinert still held his gun in his right hand. According to Kleinert, despite his hold on Jackson's shirt, Jackson continued to run with Kleinert in tow and tried to climb up a rocky incline leading to the traffic bridge. As Jackson tried to climb the incline, Kleinert used the "meaty part" of his right hand— the hand holding his gun—to hit Jackson twice on the lower back with a hammer-like motion and yelled, "Get down. Get down." When Kleinert tried to "hammer-fist strike" Jackson a third time, Jackson "came back towards [Kleinert] and knocked [Kleinert] down." As they fell, Kleinert accidentally pulled the trigger of his gun, firing one bullet into Jackson's neck, killing him.[2]

On May 12, 2014, a Travis County grand jury indicted Kleinert for manslaughter. The indictment charges that he "recklessly cause[d]" Jackson's death

> by striking and by attempting to strike Larry Jackson . . . while holding a loaded firearm[,] by seizing and by attempting to physically control Larry Jackson while holding a loaded firearm, and by attempting to seize and physically control Larry Jackson without maintaining a distance between himself and Larry Jackson that was sufficient to . . . holster his [*7] firearm[.]

Relying on 28 U.S.C. § 1442, the "federal officer removal" statute, Kleinert timely removed the state prosecution to federal court. After a hearing to evaluate its jurisdiction, the district court determined that removal was proper. On June 26, 2015, Kleinert asked the district court to dismiss the indictment according to Rule 12(b)(1) of the

Federal Rules of Criminal Procedure.[3] Kleinert argued that under the Supremacy Clause, he was immune from prosecution by the local district attorney for conduct he undertook as a federal officer. Kleinert and the District Attorney ("the State") agreed that, when deciding Kleinert's motion to dismiss, the district court would "resolve any and all factual issues related" to his immunity defense. The State specifically "waive[d] the right to have any and all such factual issues be decided by a jury." After a three-day evidentiary hearing, the district court determined that Kleinert was entitled to Supremacy Clause immunity and dismissed the indictment. The State now appeals, arguing that the district court lacked subject matter jurisdiction and erroneously applied the doctrine of Supremacy Clause immunity.

II

A

We review a district court's determination of subject matter jurisdiction de novo. *United States v. Kaluza*, 780 F.3d 647, 653 (5th Cir. 2015). We review factual findings underlying that determination for clear error. [*8] *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 336 (5th Cir. 2012). Notably, "federal officer removal" under 28 U.S.C. § 1442 is unlike other removal doctrines: it "is not 'narrow' or 'limited.'" *Willingham v. Morgan*, 395 U.S. 402, 406, 89 S. Ct. 1813, 23 L. Ed. 2d 396 (1969) (quoting *Colorado v. Symes*, 286 U.S. 510, 517, 52 S. Ct. 635, 76 L. Ed. 1253 (1932)). "Although the principle of limited federal court jurisdiction ordinarily compels us to resolve any doubts about removal in favor of remand," we review a district court's decision to maintain federal-officer jurisdiction "without a thumb on the remand side of the scale." *Savoie v. Huntington Ingalls, Inc.*, 817 F.3d 457, 462 (5th Cir. 2016).

---

[2] The State has never argued that Kleinert intentionally shot Jackson, and none of the State's witnesses identified any physical evidence to contradict Kleinert's account of an accidental shooting.

[3] Rule 12(b)(1) of the Federal Rules of Criminal Procedure provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."

B

The federal-officer-removal statute provides that "any officer . . . of the United States or of any agency thereof" prosecuted "for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals" may remove the action to federal court. 28 U.S.C. § 1442(a)(1). Although not explicit in the text of the statute, the officer must also allege "a colorable federal defense" to satisfy Article III's "arising under" requirement for subject matter jurisdiction. *See Mesa v. California*, 489 U.S. 121, 129, 136-37, 109 S. Ct. 959, 103 L. Ed. 2d 99 (1989) (explaining that § 1442 is an exception to the usual "well-pleaded complaint" rule). The district court's exercise of subject matter jurisdiction in this case therefore turns on three elements. First, the defendant must be an "officer . . . of the United [*9] States" or of a federal agency (colloquially, a "federal officer"). § 1442(a)(1). Second, the state's prosecution must be either (a) "for or relating to any act under color of such office" or (b) "on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals." *Id.* Third, the defendant must "raise a colorable federal defense" to prosecution by the state. *Jefferson Cty. v. Acker*, 527 U.S. 423, 431, 119 S. Ct. 2069, 144 L. Ed. 2d 408 (1999) (citing *Mesa*, 489 U.S. at 139).

The State does not dispute that Kleinert is a federal officer, and our review of the record confirms his federal-officer status.[4] Kleinert worked full-time for the FBI investigating federal crimes. He received security clearance from the federal government and used federally issued equipment to carry out his regular job duties. Nothing in the record indicates

that this federal assignment was merely temporary or otherwise limited in scope. Kleinert is therefore a federal officer for purposes of removal.

To satisfy the second element—the "color of office test"[5] —the defendant must "show[] a 'causal connection' between the charged conduct and asserted official authority." *Willingham*, 395 U.S. at 409. In other words, "[i]t must appear that the prosecution . . . arise[s] out of the acts done by [the officer] under color [*10] of federal authority and in enforcement of federal law . . . ." *Mesa*, 489 U.S. at 132-33. Importantly, the State's allegations do not control the causal-connection analysis. *Osborn v. Haley*, 549 U.S. 225, 249-50, 127 S. Ct. 881, 166 L. Ed. 2d 819 (2007). Rather, courts must "credit [the officer's] theory of the case" to determine whether the officer "ha[s] made an adequate threshold showing that the suit is 'for a[n] act under color of office.'" *Jefferson Cty.*, 527 U.S. at 432 (citation omitted). For example, if, in opposing removal, the state contends that the federal officer was not acting in his official capacity but instead "may have been on a frolic of his own[,]" then the officer "should have the opportunity to 'present his version of the facts to a federal court.'" *Osborn*, 549 U.S. at 251 (alterations omitted) (quoting *Willingham*, 395 U.S. at 409). An officer is not required to definitively "exclude[] the possibility that the suit is based on acts or conduct not justified by his federal duty" before removal. *Id.* at 249.

Kleinert satisfied the color-of-office element. In his notice of removal, Kleinert said he was a specially deputized federal agent who investigated bank robberies for the FBI's local task force. Kleinert alleged that he first encountered Jackson while

[4] Although the State does not challenge Kleinert's status as a federal officer, we nonetheless address it here because it affects our jurisdiction, and "we have a constitutional obligation to satisfy ourselves that subject matter jurisdiction is proper before we engage the merits of an appeal." *Ziegler v. Champion Mortg. Co.*, 913 F.2d 228, 229 (5th Cir. 1990).

[5] Although § 1442(a)(1) provides two alternatives to satisfy the second element of subject matter jurisdiction, the district court considered only one: whether the State prosecuted Kleinert for or relating to an act taken under color of federal office. Because the district court did not reach, and the parties have not briefed on appeal, whether the State prosecuted Kleinert "on account of any right, title or authority claimed under [federal law] for the apprehension or punishment of criminals," we likewise do not consider this alternative.

investigating a bank robbery—a federal crime—and, during their interaction, developed probable cause to believe [*11] that Jackson was trying to rob or defraud the same bank—also federal crimes—culminating in the chase. According to Kleinert, federal law authorized him to arrest Jackson based on probable cause, and Kleinert engaged in the conduct that the State charged as criminal (striking Jackson, attempting to physically control Jackson, and failing to holster his gun) during the arrest.

Evidence presented at the district court's removal hearing supports these allegations. Another task force officer testified that the robbery at Benchmark Bank was indeed a federal investigation. The officer also testified that he too believed federal law authorized him to arrest, without a warrant, a person whom he has probable cause to believe committed a federal crime. Bank employees Sheila Bostick and Kimberly Menge both confirmed Kleinert's recollection of Jackson's conduct, including that Jackson pretended to be William Majors and ran away when Kleinert questioned him—facts that would support probable cause.

Thus, crediting Kleinert's theory of the case—as Supreme Court precedent requires—the State seeks to prosecute him for actions he took as he tried to arrest Jackson, and federal law authorizes federal officers [*12] like Kleinert to arrest upon probable cause of a federal crime, such as bank robbery or bank fraud. Kleinert therefore made the "adequate threshold showing" that the State prosecuted him for acts he took "under color of [federal] office." *See* § 1442; *accord Jefferson Cty.*, 527 U.S. at 432.

To satisfy the third element, the officer must allege a "colorable" federal defense. *See, e.g.*, *Mesa*, 489 U.S. at 129 ("[F]ederal officer removal must be predicated on *the allegation of* a colorable federal defense." (emphasis added)). "Colorable" here means plausible, not "clearly sustainable." *Jefferson Cty.*, 527 U.S. at 432; *accord United States v. Todd*, 245 F.3d 691, 693 (8th Cir. 2001).

"[R]equiring a 'clearly sustainable defense' . . . would defeat the purpose of the removal statute." *Jefferson Cty.*, 527 U.S. at 432 (quoting *Willingham*, 395 U.S. at 407). Indeed, "one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court." *Willingham*, 395 U.S. at 407; *see also Venezia v. Robinson*, 16 F.3d 209, 212 (7th Cir. 1994) ("Once the federal defendant has a plausible federal defense, removal is appropriate so that the federal court may determine whether the defense succeeds.").

The allegations outlined above likewise support Kleinert's defense of Supremacy Clause immunity. As we discuss more fully below, Supremacy Clause immunity protects federal officers, acting within their federal authority, from liability under state law. Because Kleinert plausibly alleged [*13] that he was acting as a federal officer at the time of the shooting, he sufficiently asserted a colorable federal defense. Kleinert therefore properly removed the state-court action, and the district court validly exercised its subject matter jurisdiction.

To resist this conclusion, the State challenges Kleinert's ability to prevail on the issues of whether he was acting as a federal officer when he shot Jackson and whether Supremacy Clause immunity applies. Specifically, the State argues that Kleinert must "exclude the possibility" that prosecuted him for conduct "not justified by his federal duty"—an argument the Supreme Court has already rejected. *See Osborn*, 549 U.S. at 249. The State also urges several fact-specific arguments about the scope of Kleinert's authority to conduct warrantless arrests and whether probable cause existed. Because the standard for federal officer removal tests only the plausibility of the officer's allegations, the State's arguments that removal is unavailable because, in its view, Kleinert will not ultimately prevail are unavailing. Because an officer "need not win his case before he can have it removed," Kleinert's allegations and supporting evidence were sufficient for removal. *See*

*Willingham*, 395 U.S. at 407.

Having [*14] satisfied ourselves of jurisdiction, we turn to the merits of Kleinert's Supremacy-Clause-immunity defense to decide whether the district court properly dismissed the indictment.

### III

### A

We review a district court's decision on a motion to dismiss an indictment de novo. *United States v. Cordova-Soto*, 804 F.3d 714, 718 (5th Cir. 2015). We review factual findings underlying that decision for clear error.[6] *Id.* "A factual finding is clearly erroneous only if, based on the entirety of the evidence, the reviewing court is left with the definite and firm conviction" that the district court made a mistake. *Id.* A factfinder's choice between "two permissible views of the evidence . . . cannot be clearly erroneous." *Mid-Continent Cas. Co. v. Davis*, 683 F.3d 651, 654 (5th Cir. 2012) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985)).

### B

As other courts have noted, Supremacy Clause immunity is a "seldom-litigated corner" of constitutional law. *E.g.*, *Wyoming v. Livingston*, 443 F.3d 1211, 1213 (10th Cir. 2006). It applies only when a federal officer is "held in the state court to answer" for (1) an act that federal law

"authorized" the officer to undertake, and (2) "in doing that act, he did no more than what was necessary and proper for him to do." *Cunningham v. Neagle*, 135 U.S. 1, 75, 10 S. Ct. 658, 34 L. Ed. 55 (1890). For conduct to be "necessary and proper," an officer must subjectively believe that his actions were appropriate to carry out his federal duties, and that belief must be objectively reasonable.[7] *See, e.g.*, *New York v. Tanella*, 374 F.3d 141, 147 (2d Cir. 2004); *Kentucky v. Long*, 837 F.2d 727, 745 (6th Cir. 1988). In other [*15] words, the Supremacy Clause prohibits a state from punishing, whether by local prosecution or private suit under state law, (1) a federal officer; (2) authorized by federal law to perform an act; (3) who, in performing the authorized act, did no more than what the officer subjectively believed was necessary and proper; and (4) that belief was objectively reasonable under the circumstances.

### 1

The State does not challenge that Kleinert is a federal officer for purposes of Supremacy Clause immunity, so we do not analyze this element of Kleinert's defense.[8] We therefore do not address whether the district court's conclusion that Kleinert's special deputations by the FBI, on their own, are enough to show that he is a federal officer. The State has chosen to leave this holding undisturbed.

---

[6] Noting uncertainty about the appropriate standard when a defendant raises Supremacy Clause immunity as a defense to prosecution, the State urges us to apply out-of-circuit cases requiring a district court to "assume the truth of the allegations in the indictment," and deny a Rule 12(b) motion to dismiss if the State raises any genuine issue of fact. *See New York v. Tanella*, 374 F.3d 141, 148 (2d Cir. 2004) (citing *Kentucky v. Long*, 837 F.2d 727, 752 (6th Cir. 1988)). Regardless of the propriety of the standard applied by other circuits, the State waived this argument by specifically agreeing to have the district court resolve "any and all factual issues" bearing on Kleinert's immunity defense and forgoing decision by a jury. *See McCaig v. Wells Fargo Bank (Tex.), N.A.*, 788 F.3d 463, 476 (5th Cir. 2015) ("A party cannot complain on appeal of errors which he himself induced the district court to commit.").

[7] The State asks us to hold, contrary to every circuit that has considered Supremacy Clause immunity, that the relevant inquiry is not whether the officer's *belief* in the propriety of the conduct was objectively reasonable, but whether the conduct itself, according to qualified immunity principles, was constitutionally reasonable. The State neglected to urge the district court to adopt this qualified immunity-like standard, presenting it for the first time on appeal. The standard we articulate is the same standard the State relied on in its opposition to Kleinert's motion to dismiss. We therefore find this argument waived. *See Dunbar v. Seger-Thomschitz*, 615 F.3d 574, 576 (5th Cir. 2010) (refusing to consider new theories or new issues absent extraordinary circumstances).

[8] We also do not address whether the standards for satisfying the federal-officer element of removal under 28 U.S.C. § 1442 and the federal-officer element of Supremacy Clause immunity are materially distinct.

2

Addressing the second element of Supremacy Clause immunity, the State argues that federal law did not authorize Kleinert to arrest Jackson for three reasons.

First, the State contends that Kleinert's task force operated under a "Memorandum of Understanding" that limited its officers' federal responsibilities. Specifically, the State argues that the task force's "mission," as stated in the memorandum, limited officers to investigating specifically **[*16]** enumerated "violent" crimes. In the State's view, because Jackson was nonviolent, Kleinert acted outside of this mission statement, and thus outside of his federal authority, when he tried to arrest Jackson. This position overlooks that the text of the memorandum does not unequivocally limit the types of crimes that task force officers may investigate. Indeed, FBI Special Agent Dennis May, who created the task force, testified that Kleinert's "authority to act as a federal officer was *not* limited to the [memorandum]; . . . he had a broader scope of authority." The State also emphasizes that the memorandum says, "Responsibility for conduct, not under the direction of [an FBI special agent in charge or supervisory special agent], of each [task force] member . . . shall remain with the respective agency head[.]" Under this subsection, the State argues, unless a superior officer of the FBI specifically directs a task force officer to investigate potential criminal activity, doing so is acting without federal authority. Again, according to Special Agent May, who created the task force, as well as Supervisory Special Agent Phillip Gadd, who oversaw its daily operations, not so. Both agents **[*17]** testified, for example, that federal law authorized their task force officers, who were subject to the memorandum, to make warrantless arrests. Special Agent May said that a task force officer with "reason to believe a person has committed bank fraud"—a nonviolent offense not listed in the memorandum—has "the duty to investigate and arrest." Supervisory Special Agent Gadd further explained that a task force

officer who observes criminal activity, but "let[s] the person] go," violates the officer's general "obligation to enforce the laws of the United States . . . and oath to do so." *See Neagle*, 135 U.S. at 59 (holding that officers act within their federal authority so long as they act according to "any obligation fairly and properly inferable from [the Constitution], or any duty of the [officer] to be derived from the general scope of his duties under the laws of the United States").

Second, the State argues that Kleinert cannot have acted according to federal law because the FBI's "shoot team," an interagency body that occasionally investigates officer-involved shootings, did not investigate Kleinert. Without citing any supporting facts or applicable legal authority, the State argues that "the lack of federal **[*18]** response in this case shows that the FBI did not consider [Kleinert] to have been acting pursuant to federal duties." Contrary to this assertion, Special Agent May testified that the FBI deploys its "shoot team" only when the special agent in charge determines, in the agent's discretion, that an investigation is warranted. The State did not ask Special Agent May to elaborate on what considerations underlie exercising this discretion. And on appeal, the State does not address his testimony.

Third, the State challenges the district court's finding that federal law authorized Kleinert to arrest Jackson because, according to the State, Kleinert lacked probable cause of criminal activity. Importantly, the State concedes that federal law authorized Kleinert, as a special deputy for the FBI, to make warrantless arrests for any federal felony if he has probable cause. *See* 21 U.S.C. § 878. The State argues, however, that the circumstances surrounding Jackson's presence at Benchmark Bank were "insufficiently developed" for Kleinert to have probable cause of any federal felony.

Probable cause exists when all of the facts known by a police officer "are sufficient for a reasonable person to conclude that the suspect **[*19]** had committed, or was in the process of committing, an

offense." *United States v. Castro*, 166 F.3d 728, 733 (5th Cir. 1999) (en banc); *accord Maryland v. Pringle*, 540 U.S. 366, 371, 124 S. Ct. 795, 157 L. Ed. 2d 769 (2003) ("To determine whether an officer had probable cause to arrest an individual . . . examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause[.]" (quoting *Ornelas v. United States*, 517 U.S. 690, 696, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996))). When Kleinert tried to arrest Jackson, he knew the following suspicious facts:

• Benchmark Bank was robbed earlier that day.

• After approaching the front door of the bank, which bore a sign indicating the bank was temporarily closed, Jackson appeared to leave, but almost immediately returned. He tried to get in the bank again by pulling on the clearly locked door.

• When bank employee Sheila Bostick went outside to tell Jackson that the bank was closed, he identified himself as "William Majors," a wealthy customer and friend of the bank's president. Jackson said he "need[ed]" to withdraw money from "his" (Majors's) account. Both Bostick and Kimberly Menge, another bank employee who heard Jackson identify himself, knew that Jackson was not William Majors.

• Kleinert then spoke to Jackson, who changed his story after Kleinert **[*20]** identified himself as law enforcement. Jackson admitted he was not Majors and now purported to be Majors's brother. But Jackson refused to call "his brother" at Kleinert's request.

• Jackson said he walked to the bank after being involved in a car wreck some distance away, but Jackson wasn't sweaty or disheveled from his walk, as one would expect on a hot Texas day.

• Throughout his conversation with Kleinert, Jackson appeared to "obscure [his] face" with his phone, a tactic Kleinert recognized as suspicious from his experience in other robbery

cases.

• Jackson then "took off running."

Viewed collectively, this evidence constitutes probable cause of at least two federal felonies: bank robbery and bank fraud. A person commits federal bank robbery if he "enters or attempts to enter any bank . . . with intent to commit in such bank . . . any felony affecting [the] bank . . . ." 18 U.S.C. § 2113; *accord United States v. Dentler*, 492 F.3d 306, 310 (5th Cir. 2007) (listing the elements of bank robbery). A person commits federal bank fraud if he "knowingly [tries] to execute, a scheme or artifice . . . to obtain any of the moneys [or] funds . . . under the custody or control of[] a financial institution, by means of false or fraudulent pretenses, representations, or **[*21]** promises . . . ." 18 U.S.C. § 1344; *accord United States v. McCauley*, 253 F.3d 815, 819 (5th Cir. 2001) (listing the elements of bank fraud). Here, Kleinert saw Jackson try to enter Benchmark Bank by lying about his identity so he could take money from someone else's account. This is sufficient for probable cause. The State argues that this evidence amounts only to reasonable suspicion. Even if Kleinert had only a reasonable suspicion of criminal activity during his conversation with Jackson, when Jackson ran away, Kleinert then had probable cause to arrest. *See Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000) ("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."); *Kolender v. Lawson*, 461 U.S. 352, 366 n.4, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983) (noting that a person's flight from a lawful investigatory stop "may often provide the necessary information, in addition to that the officers already possess, to constitute probable cause"). With probable cause of two federal felonies, Kleinert was authorized to arrest Jackson under 21 U.S.C. § 878.

Each of the State's arguments that Kleinert lacked federal authority to arrest Jackson is belied by the record. More importantly, the district court heard

all of these fact-based arguments, and we cannot say that the district court's conclusion in Kleinert's [*22] favor is clearly erroneous. *See Mid-Continent Cas. Co. v. Davis*, 683 F.3d 651, 654 (5th Cir. 2012) ("[When] there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

3

The State also challenges whether Kleinert, in trying to arrest Jackson, did no more than what he subjectively believed was "necessary and proper." This subjective element depends on an officer's "'honest[]' belief that his actions are reasonable and necessary to the exercise of his authority." *Livingston*, 443 F.3d at 1221. Any evidence of "personal interest, malice, [or] actual criminal intent" will negate subjective reasonableness. *Baucom v. Martin*, 677 F.2d 1346, 1350 (11th Cir. 1982).

Here, we focus on the conduct for which the State seeks to hold Kleinert liable. The indictment charges as criminally reckless:

- Kleinert's failing to maintain a sufficient distance between himself and Jackson to holster his firearm;
- seizing and attempting to physically control Jackson while holding a loaded firearm; and
- striking Jackson while holding a firearm.

As the district court concluded, none of the evidence suggests that Kleinert acted out of personal interest or bore any ill will toward Jackson. Kleinert and Jackson were strangers, and Kleinert approached Jackson only after a Benchmark Bank employee, who suspected [*23] Jackson of wrongdoing, asked Kleinert to do so during an ongoing federal investigation.

Kleinert testified that "it's procedure . . . for your own protection, to pull your weapon when . . . arrest[ing] somebody that you believe is a fleeing felon." Kleinert also testified that once he drew his weapon, he could not re-holster it before going "hands-on" with Jackson because, to do so, he would have had to "take [his] eyes off of" Jackson and "look down at [his] holster"—a task made more difficult by Kleinert's plain clothes, including a baggy, untucked shirt. According to Kleinert, "tak[ing his] eyes off of [a] suspect" before apprehending him is dangerous. Kleinert also explained that he used "hammer-fist" strikes, a technique he learned from police training, to gain compliance. Jackson had run away from Kleinert twice already and continued to resist even as Kleinert physically held on to Jackson's shirt. After the shooting, Kleinert immediately called a "dispatch communications supervisor" to report what happened, simply saying, "I just shot somebody." Kleinert also seemed concerned that EMS and other officers weren't arriving quickly enough.

The State argues that Kleinert's "evolving account of [*24] the shooting" proves that he did not subjectively believe his actions were necessary and proper. The State emphasizes that, at times, Kleinert described Jackson as seeming to "spin" or "turn" toward him as they fell down moments before Kleinert fired the fatal shot. For example, the State points to Kleinert's grand jury proceedings, during which he tried to reenact the altercation:

> I hit him right here and I say, get down on the ground. And I do it again . . . . And he gets up and he spins and he goes this way and goes this way. And I spin again to try to hit him again as . . . he's passing me but . . . as he's doing that . . . I just fall. . . . [A]s I'm falling . . . I hear my gun go off and I'm thinking to myself, how did my gun go off?

At other times, Kleinert described Jackson as falling backwards into him. At the district court's evidentiary hearing, Kleinert testified:

> After that second strike, I began a third strike, and [Jackson] spun and came back towards me and knocked me down. And as I'm delivering that third strike, I'm falling at the same time. And, as I'm falling, I hear my gun discharge. And I'm thinking to myself, "Why is my gun discharging?"

Based on its perceived inconsistencies [*25] in Kleinert's testimony, the State asserts that Kleinert is trying to more favorably "shape his narrative . . . to match the evidence" by now describing Jackson as falling "backwards" rather than "spinning" toward him. In the State's view, this supposedly sudden change of testimony indicates Kleinert does not subjectively believe in the propriety of his conduct.

Tasked with "resolv[ing] any and all factual issues," which necessarily includes the credibility of witnesses, *see In re Tusa-Expo Holdings, Inc.*, 811 F.3d 786, 789 n.1 (5th Cir. 2016), the district court found that "any variation[]" in Kleinert's testimony was "insignificant" and merely the result of "testify[ing] several times under different circumstances and [being] questioned in different contexts." Overall, the court believed Kleinert's testimony was "straightforward, direct, consistent, and without evasion," leading it to conclude that "Kleinert honestly believed that his actions were justified." Nothing in the record indicates that the district court's conclusion that Kleinert subjectively believed his conduct was necessary and proper is clearly erroneous. *See French v. Allstate Indem. Co.*, 637 F.3d 571, 577 (5th Cir. 2011) ("[T]he burden of showing that the findings of the district court are clearly erroneous is heavier if the credibility of witnesses is a factor in the trial [*26] court's decision." (quoting *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 375 (5th Cir. 2000)).

4

The State's final argument is that Kleinert's belief that he did no more than what was necessary and proper to arrest Jackson was objectively unreasonable under the circumstances. In analyzing objective reasonableness, courts must "evaluate the circumstances as they appear to federal officers at the time . . . rather than the more subtle and detailed facts later presented to a court." *Livingston*, 443 F.3d at 1229; *accord Tanella*, 374 F.3d at 151. Again, we focus here on the circumstances surrounding the conduct that the State charges as

criminally reckless: Kleinert's failing to maintain enough distance from Jackson so that Kleinert could holster his gun, seizing Jackson while holding a loaded gun, and striking Jackson while holding a gun.

Numerous law enforcement officers testified that Kleinert acted consistently with his training and with what other officers would have done under the circumstances. For example, FBI Special Agent Dennis May testified that "[i]t's extremely difficult with one hand, especially with any kind of clothing over that holster, to reholster [a firearm]." He also repeatedly testified that "using a firearm as an impact weapon . . . is a proper use of a firearm. Special Agent May described [*27] that an armed officer has few options when a suspect is resisting arrest:

> [I]f you have a weapon in your hand and you are in a situation where a person is resisting, unfortunately, you can't throw that weapon on the ground and you may not be able to get it back in the holster. . . . [I]t's just difficult to say what you could possibly do with that weapon.

A lieutenant with the Austin Police Department testified that, like Kleinert, he and other officers "have gone hands on" with suspects while holding their firearms. A training instructor for the department testified that when teaching the "mechanics of an arrest," the Austin Police Department specifically instructs its officers to "draw their weapon[s] and order a suspect to get down on the ground if the circumstances call for it" and "to close the distance to a suspect while their firearm[s are] still drawn." In addition, the department teaches its officers to perform hammer-fist strikes while holding a weapon, although not necessarily a firearm.

Addressing Kleinert's specific circumstances, this training instructor testified that Kleinert's decision to hammer-fist strike Jackson was "appropriate for [Jackson's] level of resistance." He explained:

> [T]he situation [*28] being [w]hat it is, not having the availability to holster the weapon,

still in a struggle, still in the fight, in those circumstances . . . the gun was in his hand and he's wanting to deliver hammer fist strikes, then -- I mean, we don't teach people to throw your gun to the side or put it underneath your arm or anything like that . . . .

Another officer reiterated this point. He testified that an employee of the district attorney's office asked him to testify that hammer-fist striking a suspect while holding a gun violated the Austin Police Department's policy and usual practices. The officer responded that he would not testify to that "because it wasn't true" and that anyone willing to say that "would have to perjure themselves."

The State presented little evidence to the contrary. A single expert witness for the State, a former police officer turned private consultant from Colorado, testified that guns should not be used as impact weapons because "[a]ny hands-on contact with an individual is highly dangerous if one of those hands is occupied by a firearm." The expert explained that an officer who brandishes a weapon has "limited . . . ability to control" a suspect, so the officer should re-holster [*29] before trying to apprehend the suspect. On cross-examination, however, he admitted that he had "no problem" with Kleinert's decision to draw his weapon and approach Jackson with his gun in hand; he even testified that "it was good police tactics" for Kleinert to do so. The State's expert agreed that "good, reasonable police officers" sometimes go "hands-on" with suspects while still holding a firearm. Further, he admitted that, because Kleinert didn't know whether Jackson was armed, if Kleinert had holstered his gun before approaching Jackson, it was "quite possible" that Jackson could have seriously injured or killed Kleinert before he would have had sufficient time to draw his weapon again.

Presented with substantial testimony in Kleinert's favor and little evidence that his conduct was objectively improper, the district court concluded that Kleinert's belief that he acted appropriately was objectively reasonable. Drawing on a similar case, the district court emphasized that "close-quarter

situation[s]" like this one are "hardly conducive to detached deliberation." *Tanella*, 374 F.3d at 151. In this "hand-to-hand struggle," a fact supported by the forensic evidence, Kleinert necessarily reacted on a "split-second basis," [*30] and accidentally fired his gun—what the State's own expert called a "sympathetic" or involuntary discharge. *See id.* All of this evidence supports the district court's conclusion that Kleinert's *belief* in the propriety of his conduct was objectively reasonable. Kleinert thus satisfied each element of the Supremacy-Clause-immunity analysis.

## IV

We hold that the district court properly exercised jurisdiction according to the federal officer removal statute, 28 U.S.C. § 1442, and Kleinert's assertion of a colorable federal defense. The district court likewise correctly granted Kleinert's motion to dismiss because he is entitled to immunity from state prosecution under the Supremacy Clause of the Constitution.

We note, however, even if a federal officer satisfies every element of the immunity standard, the Supremacy Clause cannot shield the officer from *federal* consequences, such as prosecution by federal authorities or civil liability under federal law. Supremacy Clause immunity merely confirms that the Constitution and laws of the United States are "supreme" and cannot be obstructed—here, via local prosecution—by the laws of the individual states. *See* U.S. Const. art.VI, cl. 2.

AFFIRMED.

---

**End of Document**